**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| LESLIE D. KARVELIS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-03-3848 |
| | § | |
| RELIANCE STANDARD LIFE | § | |
| INSURANCE CO., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

Plaintiff, Leslie D. Karvelis, sued Reliance Standard Life Insurance Co. ("Reliance Standard"), alleging that it wrongfully denied her claim for long-term disability benefits for her inability to work due to chronic fatigue syndrome ("CFS").  Karvelis asserts causes of action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, seeking compensation for her denied benefits and attorney's fees.  This court previously dismissed Karvelis's state-law claims for breach of contract, breach of the duty of good faith and fair dealing, and violations of Article 21.21 of the Texas Insurance Code and section 17.46 of the Texas Deceptive Trade Practices Act, on the basis of ERISA preemption.  Reliance Standard has now moved for summary judgment, arguing that there is no genuine issue of disputed fact material to determining whether the plan administrator abused its discretion in denying Karvelis's claim.  (Docket Entry No. 21).  Karvelis responded and cross-moved for summary judgment as to her right to the long-term disability

benefits.  (Docket Entry Nos. 25 & 26),  Reliance Standard responded to Karvelis's cross-motion.  (Docket Entry No. 30).

Based on the pleadings, the motion, cross-motion and responses, the parties' submissions and the applicable law, this court GRANTS Reliance Standard's motion for summary judgment and DENIES Karvelis's cross-motion for summary judgment, and enters final judgment for Reliance Standard by separate order.  The reasons for these rulings are set out in detail below.

## I.      Background

### A.      The Long-Term Disability Policy Terms

Reliance Standard insured Karvelis for long-term disability coverage starting in September of 1995, through her employer, AIM Management Group, Inc.  The insurance policy contains a clause granting discretion to Reliance Standard in deciding claim eligibility:

> Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the Plan.  The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits. Decisions by the claims review fiduciary shall be complete, final and binding on all parties.

(Docket Entry No. 24, Ex. A, p. LTD012)[1].

---

[1]  The administrative record provided by Karvelis is attached to Docket Entry No. 24 and is referred to by page number (LTD###).  The administrative record provided by Reliance Standard is attached to Docket Entry No. 30 and is referred to by page number (WOP###).  The records largely contain the same documents in different order, except that Karvelis's record contains documents from the 2002 Social Security Administration decision that Reliance Standard's record does not.  Reliance Standard's record also includes Karvelis's original petition; Karvelis's record does not.

The policy provides for payment of long-term disability benefits if the insured person "(1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) is under the regular care of a Physician; (3) has completed the Elimination Period; and (4) submits satisfactory proof of Total Disability to us."  (LTD009).  "Total Disability" is defined as follows:

> "Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness, during the Examination Period and thereafter an Insured cannot perform the material duties of his/her regular occupation;
>
> > (1) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis.  An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; and
> >
> > (2) "Residual Disability" means being Partially Disabled during the Elimination Period.  Residual Disability will be considered Total Disability.
>
> If an Insured is employed by you and requires a license for such occupation, the loss of such license for any reason does not in and of itself constitute "Total Disability."

(LTD008).

The Policy also includes a 24-month limit for benefits payable for disability caused or contributed to by mental or nervous disorders:

> Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime duration of twenty-four (24) month unless the Insured is in a Hospital or Institution at the end of the twenty-four (24) month period.

The Monthly Benefit will be payable while so confined but not beyond the Maximum Duration of Benefits.

(LTD014).  The policy goes on to list mental or nervous disorders excluded by the limitation:

> (1) bipolar disorder (manic depressive syndrome);
> (2) schizophrenia;
> (3) delusional (paranoid) disorders;
> (4) psychotic disorders;
> (5) depressive disorders;
> (6) anxiety disorders;
> (7) somatoform disorders (psychosomatic illness);
> (8) eating disorders; or
> (9) mental illness.

(LTD014).

### B.    Factual Background

Karvelis, born in 1955, worked for twelve years for PaineWebber Group, Inc., moving from stockbroker to administrator-manager.  In 1994, she was a corporate vice-president, working in a job that she described as very stressful.  (LTD058).  Starting in 1994, Karvelis began to feel fatigued and forgetful.  She attributed her complaints to her job, which required ten to fifteen hours of work each day.  (*Id.*, LTD050).  In the fall of 1995, Karvelis changed jobs and began to work at AIM Management Co. in mutual funds, as Manager of Custody Operations and Portfolio Administration, a job that required fewer hours than the PaineWebber position.  The job description included responsibilities for managing the daily activities of Custody Operations and Portfolio Administration, including managing the daily activities of the division supervisors, portfolio administration staff, and clerical support staff; managing portfolios for two employee groups; ensuring compliance with the S.E.C. and

federal and state regulations regarding custody operations and portfolio administration; and maintaining and purchasing computer systems.  (LTD539, 729).  The job required a minimum of five years of industry and supervisory experience.  AIM provided its employees, including Karvelis, long-term disability benefits through Reliance Standard.

Despite the lighter work load in her new job, Karvelis felt significantly increased fatigue.  (LTD058).  In February 1996, Karvelis saw a neurologist and reported that her symptoms had become worse and included lightheadedness.  (LTD076).  The neurologist recommended that Karvelis see a psychiatrist for depression.  Karvelis refused to see a psychiatrist, because "[s]he knew she was not depressed.  Her life was going well." (LTD372, LTD076).  The neurologist also prescribed a tranquilizer for depression, but Karvelis did not fill that prescription.  (LTD372).  Instead, in March 1996, Karvelis sought treatment from Dr. Salvato, an internist who specializes in CFS and runs a CFS clinic.[2]  In a December 1999 report, Dr. Portnoy, an internist who at Reliance Standard's request performed an Independent Medical Examination, characterized Karvelis's refusal to see the psychiatrist as "self-diagnosing" CFS.  Dr. Portnoy believed that Karvelis was influenced by the fact that her older sister had already been diagnosed with CFS.  (LTD076).

In Karvelis's initial visit to Dr. Salvato on March 6, 1996, she described a number of symptoms, including fatigue, mild recurring fever, painful lymph nodes, dizziness, nausea,

_____

[2]  Karvelis submitted a curriculum vitae for Dr. Salvato.  (LTD315).  Dr. Salvato has presented or authored several presentations and articles on chronic fatigue syndrome.  She also attended an invitational meeting in Bethesda, Maryland, entitled "Development of Outcome Measures for Therapeutic Trials in Chronic Fatigue syndrome" on April 11, 1995.  (LTD319).

headache, frequent sore throats, muscle aches, and joint pain, as well as a number of neuropsychological complaints, such as an inability to concentrate and memory problems. (LTD745, 758).  Dr. Salvato recorded that Karvelis might meet the requirements of CFS, but that the diagnosis required more testing.  (WOP792).   CFS is a disorder characterized by profound fatigue that is not improved by bed rest and that may be worsened by physical or mental activity.  There are no specific diagnostic tests for CFS.  It is diagnosed only by ruling out other causes, a task complicated by the fact that many illnesses have incapacitating fatigue as a symptom.  In the initial visit, Dr. Salvato reported that she did not have enough information to rule out other possible causes for Karvelis's symptoms, including depression, anxiety, or other chronic psychiatric diseases. (LTD745).  After a series of laboratory tests, but no psychiatric testing, Dr. Salvato diagnosed CFS and prescribed medication, DHEA for CFS[3] and Florinef for blood pressure.  Dr. Salvato also instructed Karvelis to limit her activity and to rest frequently.  Dr. Salvato noted that the lab analyses showed that Karvelis's B-cell count was low, which she described as a finding that can be associated with CFS.[4]

---

[3]  According to the Center for Disease Control and Prevention, "Dehydroepiandrosterone (DHEA) was reported in preliminary studies to improve symptoms in some patients.  However, in subsequent studies, this finding has not been confirmed and the use of DHEA in patients should be regarded as experimental. Its use should be limited to patients with documented abnormalities in DHEA levels and function." http://www.cdc.gov.ncidod/diseases/treat.htm (last visited July 16, 2005).  The records do not show that Karvelis had such documented abnormalities.

[4]  According to the CDC,  reduced B-cell is among "[e]xamples of specific tests that do not confirm or exclude the diagnosis of the chronic fatigue syndrome."  Center for Disease Control, Chronic Fatigue Syndrome, Case Definition, at http://www.cdc.gov/ncidod/diseases/cfs/about/definition/case_definition.htm (last visited July 26, 2005).

(LTD787).  Dr. Salvato did not perform or order any psychiatric tests or tests to measure concentration, memory, or physical strength and stamina.

After her visit to Dr. Salvato in March 1996, Karvelis experienced an improvement in her blood pressure and went back to work, but had a "flare" of symptoms and in April 1996, and took six weeks off from work.  After this break, she felt improved and attempted to return to work, but her symptoms flared again.  Her claimed disability date is May 8, 1996.[5]  (LTD718).

On May 20, 1996, Karvelis filed an application for short-term disability benefits with Reliance Standard.  (WOP826).  On May 28, 1996, Dr. Salvato informed Reliance Standard that Karvelis "meets the CDC criteria for Chronic Fatigue Syndrome."[6] (LTD777).  Karvelis attempted to return to work on a part-time basis beginning June 12, 1996, but on June 24, 1996, her symptoms returned.  Dr. Salvato recommended that Karvelis remain off work at

---

[5] Dr. Salvato stated in a letter to Reliance Standard on May 28, 1996 that Karvelis was continuously disabled beginning May 8, 1996.  (LTD777).

[6] The Center for Disease Control and Prevention states two criteria for a CFS diagnosis.  A patient must:

"1.  Have severe chronic fatigue of six months or longer duration with other known medical conditions excluded by clinical diagnosis; and

2.  Concurrently have four or more of the following symptoms: substantial impairment in short-term memory or concentration; sore throat; tender lymph nodes; muscle pain; multi-joint pain without swelling or redness; headaches of a new type, pattern, or severity; unrefreshing sleep; and post-exertional malaise lasting more than 24 hours."

Additionally, "[t]he symptoms must have persisted or recurred during six or more consecutive months of illness and must not have predated the fatigue."  Center for Disease Control, Chronic Fatigue Syndrome, at http://www.cdc.gov/ncidod/diseases/cfs/ (last visited July 19, 2005).

least until their next appointment in late July.  (LTD187).  On August 22, 1996, Reliance

Standard wrote to Karvelis, acknowledging receipt of her application for long-term disability

benefits.  (LTD749).  Before granting long-term disability benefits, Reliance Standard

performed a preexisting condition investigation.  (LTD718).  During this investigation, Dr.

Salvato informed Reliance Standard of the CFS diagnosis, stating that Karvelis was "unable

to return to work as a result of her severe, recurrent symptoms."  (WOP086–87).  Reliance

Standard accepted Dr. Salvato's diagnosis that Karvelis had CFS and found that it was not

a preexisting condition.  On October 8, 1996, Reliance Standard recommended approving

the claim for benefits.  (LTD634).  The benefit payment period began on August 6, 1996,

ninety days after the disability date of May 8, 1996.  (LTD631).  Reliance Standard notified

Karvelis that under the Policy, she was required to provide periodic medical certification of

her disability status and that her benefits would be reduced by any Social Security benefits.

(*Id.*).

On June 10, 1997, Reliance Standard asked for Dr. Salvato's records since November

8, 1996.  (LTD614).  Dr. Salvato completed a Physical Capabilities Assessment form on July

17, 1997, stating that Karvelis could only perform certain physical activities occasionally,

not consistently, and that her symptoms varied from day to day.[7]  (LTD133).  The form

appears to be based on Karvelis's report of her own capabilities and limits, rather than on

specific tests measuring those capabilities and limits.  On October 14 and 15, 1997, Karvelis

---

[7]  Dr. Salvato's report also stated that Karvelis required frequent rest periods and that her health
compromised her ability to maintain regular attendance and decreased her ability to interact appropriately
with others or complete job tasks.

underwent a Functional Capacity Evaluation ("FCE"), at Reliance Standard's request. (LTD538).  The FCE was a six and one half-hour test performed over two days, measuring the subject's cooperation, consistency of performance, pain behavior, safety, quality of movement, physical work strengths, physical restrictions and significant abilities, and comparing her capabilities to her job description as well as comparing her performance on the first day to her performance on the second day.[8]  (LTD538–40).  The report of the FCE, performed by a licensed physical therapist, concluded that Karvelis's "[p]hysical abilities do not match the job description of Manager/Mutual Funds.  Therefore, the client has not demonstrated the ability to physically return to this job."  (LTD540).[9]

Reliance Standard hired Resource Opportunities, Inc. to follow up with Dr. Salvato during 1997 and 1998, to determine Karvelis's treatment and whether and when Karvelis could return to work.  (LTD532, 548).  Resource Opportunities attempted to start Karvelis on a cardiovascular training program.  Although Dr. Salvato agreed with the recommendation that Karvelis undertake a strengthening cardiovascular program and prescribed this therapy, Karvelis was reluctant because the insurance did not cover such expenses and because she

---

[8]  The physical restrictions described by the FCE report were:
  1)  Decreased abilities for dynamic lifting and carrying
  2)  Decreased standing and walking tolerance
  3)  Decreased lower extremity strength as consistent with musculoskeletal evaluation prior to FCE testing
  4)  Decreased work pace
  5)  Decreased work endurance secondary to frequent rest periods
(LTD539).

[9]  The FCE test revealed that, with frequent breaks, Karvelis had limits in prolonged standing, walking, lifting from the floor to waist height, repetitive squatting, and stair climbing.  The test revealed "good sitting tolerance."  (LTD539).

might not physically be able to complete such a program.  (LTD546).  In February 1997, in response to questions from Resource Opportunities, Dr. Salvato stated that based on her assessment, Karvelis was still unable to work on a daily basis; while she might be able to work some days of the week on some weeks, it would not be "consistent" because of her "fatigue, muscle pain, memory and concentration problems." (LTD534).  The only objective measures that Dr. Salvato referenced were Karvelis's swollen lymph glands and throat erythema (or redness), which Dr. Salvato described as "consistent with having the flu on a daily basis."  Dr. Salvato also described a significantly "decreased natural killer cell function."[10] (LTD534).  Resource Opportunities considered rehabilitation intervention,[11] but, in a letter to Reliance Standard on February 23, 1998 summarizing their findings, stated they would not provide rehabilitation intervention for Karvelis because "she is currently unmotivated to return to work."  (LTD525).

On July 27, 1998, in response to a request from Reliance Standard, Dr. Salvato sent a report stating that Karvelis's "condition has remained essentially unchanged from previous report.  She continues to suffer from debilitating symptoms which continue to render her totally disabled from gainful employment." (LTD518).  Dr. Salvato included in that report

---

[10]  A low killer cell function is consistent with some weakness of the immune system.  (LTD534). Low killer cell function is reported in medical literature as associated with a number of conditions, ranging from HIV/AIDS, to leukemia, to herpes, to measles.  The medical literature notes that the abnormal laboratory tests Dr. Salvato cited, including Epstein-Barr early antigen and reduced B-cell and natural killer cell functions, are "[e]xamples of specific tests that do not confirm or exclude the diagnosis of the chronic fatigue syndrome."   Center for Disease Control, Chronic Fatigue Syndrome, Case Definition, at http://www.cdc.gov/ncidod/diseases/cfs/about/definition/case_definition.htm (last visited July 26, 2005).

[11]  Rehabilitation intervention is a vocational method used by Resource Opportunities to try to strengthen patients and get them back to work.

Karvelis's medical records from March 17, 1998.  (WOP136–38).  One notation in those records indicated that since February 4, 1998, Karvelis had suffered from increased depression, but without any change in fatigue or cognitive ability.[12]  (WOP136).

On October 20, 1998, the Social Security Administration denied Karvelis's application for disability benefits, stating that "the evidence does not show that your ability to perform basic work activities is as limited as you indicated.  Your overall medical condition does not limit your ability to work."  (LTD506).[13]  Reliance Standard advised Karvelis to appeal.  (LTD499).  Karvelis, in turn, asked  Reliance Standard to stop withholding her estimated Social Security benefits due to financial hardship. (LTD503). On December 18, 1998, Reliance Standard granted that request contingent on Karvelis providing a signed Social Security Refund Agreement and a report of her income and expenses. (LTD494).

Reliance Standard continued to receive Karvelis's medical reports.  In early 1999, Reliance Standard sent two notices that Karvelis's benefits would terminate unless it received her medical report.  (LTD490).  Dr. Salvato provided Reliance Standard with a report on February 26, 1999, stating that Karvelis's condition was essentially unchanged.  (LTD477). On August 10, 1999, Dr. Salvato sent a letter, as part of a renewed application for Social Security Disability Benefits, describing Karvelis's symptoms and repeating the diagnosis of

---

[12]  Dr. Salvato recorded in her records, "[I]mproved sleep.  Increased depression. . . ."  (WOP136).

[13]  The Social Security Administration relied on Dr. Salvato's medical records and a psychiatric consultative examination performed by Dr. John Kinross-Wright on September 29, 1998.  The report of that examination is not in the administrative record the parties submitted.

CFS.  (LTD372–75).   Dr. Salvato also noted Karvelis's continuing inability to work.

(LTD374).  At the time, Karvelis was taking glutathione/ATP injections, but experiencing

no significant relief.  The CDC, which Dr. Salvato cited as authoritative, notes that

glutathione (an antioxidant) is one of a number of dietary supplements sometimes used by

CFS patients, but that it has no validated therapeutic value.[14]

On December 27, 1999, Reliance Standard required Karvelis to have an Independent

Internal Medical Examination.  Dr. Benjamin L. Portnoy, a specialist in internal medicine

and infectious disease, reviewed Karvelis's medical records and examined her.  (LTD406-

411).  During the examination, Karvelis told Dr. Portnoy that recently she had been trying

to volunteer at a local school, but doing so would make her very tired and require her to rest

for days afterward.  (LTD409).  Karvelis also described to Dr. Portnoy a litany of symptoms

that she attributed to CFS, including achiness, pain in the neck, nausea, loose bowels, and

stuffy sinuses.  Karvelis told Dr. Portnoy that she was "emotional" and would "start to cry

seemingly without any reason."  (*Id.*).  Dr. Portnoy stated that Karvelis "describes many of

the features of chronic fatigue syndrome," noting that her laboratory tests "are by and large

within normal limits, and that argues against serious illnesses characterized by fatigue."

(LTD410).  Dr. Portnoy found no objective evidence of CFS, but recognized that CFS

normally has no physical findings.  (*Id.*).  Dr. Portnoy was concerned that depression or other

psychiatric disease had not been ruled out.  He stated that the goal of returning Karvelis to

---

[14]   Center for Disease Control, Chronic Fatigue Syndrome, Treatments, at http://www.cdc.gov/ncidod/diseases/cfs/treat.htm (last visited July 19, 2005).

full-time work had to "begin with psychiatric and psychological evaluation."  Dr. Portnoy was critical of Dr. Salvato, stating that she had not undertaken additional diagnosis and possible treatment for Karvelis that might provide relief.  Dr. Portnoy recommended that if the mental health evaluation revealed no psychiatric diagnosis, a new medical team should be tried, noting that three and one-half years was "at the long end for the spectrum for this syndrome."  (*Id.*).

On March 13, 2000, Reliance Standard required Karvelis to undergo an Independent Psychiatric Evaluation.  Dr. Larry M. Nahmias, a forensic psychiatrist, completed a psychiatric report based on his own examination of Karvelis and a review of her medical records and of an MMPI-2 test.[15]  (LTD385).  Karvelis told Dr. Nahmias that she had suffered depression in approximately 1983, following a second divorce.  She reported that she had also experienced depression for approximately a year after she stopped working. Recently, she had been doing "a little bit of substitute teaching and tutoring some kids at night." (LTD387).  She reported that she spent several hours each day sitting in front of her computer playing computer games and otherwise did some things around the house, read, watched television, occasionally cooked, and went out with her sister.  (LTD388).  Dr. Nahmias also noted that Karvelis believed that the glutathione shots — the antioxidants that the CDC views as without demonstrated therapeutic value — kept her "from being in bed all day." (LTD387).  Dr. Nahmias recorded Karvelis's medications as including echinacia, co-enzyme Q, ginko biloba, and multi-vitamins, and noted her weekly attendance at a CFS

---

[15]  Minnesota Multiphasic Personality Inventory-2.

support group.  It is unclear whether these additional medications were prescribed by Dr. Salvato or were self-administered.  The CDC information on CFS notes that these herbal preparations are "claimed to have benefit to CFS patients," but that their benefit has not been confirmed.[16]

Dr. Nahmias diagnosed Karvelis with a somatization disorder, a mental disorder that manifests itself in physical symptoms, as well as chronic fatigue syndrome.  (LTD389). According to Dr. Nahmias, "[t]he diagnosis of Somatization Disorder is based upon the claimant's MMPI as well as the fact that the claimant has had ongoing incapacitating focus on physical symptoms out of proportion to what is usually expected with chronic fatigue syndrome."  (LTD389).  Dr. Nahmias noted that, "[a]lthough the claimant has subjective complaints of concentration problems, this is not noted in this examination." (LTD390).  Dr. Nahmias interviewed Karvelis for two hours with a fifteen-minute break and stated that "there was no evidence of any fatigue or inability of the claimant to process information or questions presented to her."  (*Id.*).  The questions included those designed to test short-term memory and measure cognitive functioning; Karvelis performed well.

Dr. Nahmias was also critical of the treatment Karvelis had received.  He emphasized that Karvelis had received no treatment to address the psychological aspects of her illness. He noted that "[u]nfortunately, the claimant very quickly determined that she had chronic fatigue syndrome because her sister also had the same symptoms.  This will be a barrier

---

[16]    Center for Disease Control Website, Chronic Fatigue Syndrome, Treatments, at http://www.cdc.gov/ncidod/diseases/cfs/treat.htm (last visited July 19, 2005).

towards her accepting any psychological intervention." (*Id.*).[17] Dr. Nahmias estimated that Karvelis's return-to-work date could be six months to a year — although not to her prior job at AIM — if a psychological course of treatment ran concurrently with physiological treatment. (LTD384).  Dr. Nahamias recommended that Karvelis meet with a cognitive behaviorally-oriented medical psychologist on a weekly, then biweekly, basis, to treat both the physical symptoms of chronic fatigue syndrome and the psychological overlay. (LTD390).

On May 19, 2000, Reliance Standard gave Karvelis written notice of its decision to cancel her long-term disability benefits effective June 6, 2000.  (LTD376).  Reliance Standard relied on Dr. Salvato's medical records, Dr. Portnoy's examination, and Dr. Nahmias's report in determining that Karvelis's condition was "primarily a mental condition and has been since March 1998."  (LTD377).  Reliance Standard relied on Dr. Salvato's reports from February 4, 1998 to December 17, 1998, noting that on February 4, 1998, Dr. Salvato had reported new symptoms of headaches and sleep problems with worsening body aches and no change in fatigue; and described an increase in depression in the March 17, 1998 records and increased medication on October 23, 1998 because of an inability to think clearly.  Dr. Salvato's December 17, 1998 notes reflected increased fatigue and worsened cognitive function along with other impairments.  (LTD376).  Reliance Standard noted that Dr. Salvato's laboratory tests were largely within normal limits and that Dr. Portnoy's

_____

[17]  Karvelis's older sister was diagnosed with chronic fatigue syndrome before Karvelis's diagnosis. (LTD387).

examination found no objective evidence of disease, but acknowledged that normally CFS has no physical findings.  The letter relied on the facts that Karvelis's "condition is basically self-reported and cannot be verified using generally accepted standard medical procedures and practices"; Dr. Portnoy's statement that "three and a half years of fatigue is definitely the long end of the spectrum for this syndrome"; and the report of the independent psychiatric evaluation showing a somatization disorder, "the process of expressing a mental condition as a disturbed bodily function."  (*Id.*).  Based on the records and the reports from Drs. Salvato, Nahmias and Portnoy, Reliance Standard determined that Karvelis had suffered from what was primarily a mental condition since March 1998, triggering the 24-month limitation on benefits for a disability caused by or contributed to by a mental illness or disorder. (LTD376–77).

On June 19, 2000, in response to the benefits denial, Dr. Salvato sent a letter to Reliance Standard requesting review.  (LTD367–68).[18]  Dr. Salvato disagreed with Reliance Standard's assertion that Karvelis's condition was "primarily a mental condition." (LTD367).  Dr. Salvato noted that "depression does not rule out the diagnosis of Chronic Fatigue Syndrome unless it is a melancholic or psychotic depression, none of which Ms. Karvelis has been diagnosed with."  (*Id.*).  Dr. Salvato also contested the assertion that Karvelis's laboratory tests were in the normal range.  Dr. Salvato described her June 13, 2000 evaluation of Karvelis, in which she noted Karevelis's complaints of symptoms that

---

[18]   In the letter, Dr. Salvato stated that she has seen many CFS cases and is "very familiar with the pathology of this disease."  (LTD368).

prevented her from "engaging in prolonged sitting, standing and walking, understanding, remembering and following through on even simple instructions, interacting with others and maintaining a satisfactory work presence."   Dr. Salvato noted that Karvelis reported increasingly severe fatigue and, in what appears to be a typographical error, "a significant intensification of her cognitive abilities." (LTD368).  Dr. Salvato cited Karvelis's complaints of inability to sit uninterrupted for a maximum of 20 minutes, inability to stand or walk for prolonged periods, need for frequent rest periods, and  inability to concentrate.  (*Id.*).  Although there were some days during which Karvelis might be able to function well, Dr. Salvato stated that such periods could be followed by days of "being totally bedridden," with unpredictable symptom severity.  (*Id.*).  Dr. Salvato remained of the opinion that Karvelis was totally and permanently disabled from any gainful employment.  (*Id.*).  Dr. Salvato "consider[ed] Ms. Karvelis's complaints to be credible and she is not a malingerer nor can [Dr. Salvato] imagine that [Karvelis] would be seeking secondary gain." (*Id.*).  Dr. Salvato concluded that Karvelis's disability was due to a physical condition and asked Reliance Standard to reconsider its cessation of payments.  (*Id.*).

On June 30, 2000, Reliance Standard acknowledged receipt of the appeal and informed Karvelis's attorney that a final decision would take more than 60 days.  (LTD308). Reliance Standard decided that Karvelis should undergo another Functional Capabilities Evaluation.  (LTD300).  During this test, Karvelis demonstrated "sitting tolerance" of 57 minutes "during keyboard activity and history review" without complaints or signs of pain and 38 minutes of standing tolerance with a report of fatigue at termination.  (LTD 256).  The

FCE report concluded that Karvelis had a workday tolerance of 8 hours, including 8 hours of sitting in 60 minute durations, 3 to 4 hours of standing in 35 minute durations, and 3 to 4 hours of walking in frequent, short distances. (LTD253). This compared to the 1997 FCE results, in which Karvelis was unable to complete the test for prolonged standing or walking because of fatigue. (LTD538–40). Applying the Department of Labor's Physical Demand Levels, the physical therapist determined that Karvelis could "work in the Light to Moderate physical capacity level based on her occasional lifting capabilities." (LTD252).

Reliance Standard also hired Faction, Inc. to perform an activities check on Karvelis. (LTD247). On November 30, 2000, an investigator spoke with neighbors and learned that Karvelis took care of several children in her home during the afternoon and evening hours. (LTD223). In response to the investigator's questions, Karvelis said that she "schools five to six special children" in subjects like "life skills" and math, paid for by parents and organized through her church. (*Id.*). Karvelis reported teaching children for "about five to six years." (*Id.*).

On December 7, 2000, Reliance Standard denied Karvelis's appeal. (LTD216–19). Reliance Standard relied on both the twenty-four month limitation for benefits for disability caused or contributed to by mental or nervous disorders and the contract definition of "Total Disability," claiming that Karvelis was not sufficiently limited in her physical or cognitive problems to meet this definition. (LTD217). Using the Department of Labor's Dictionary of Occupational Titles, Reliance Standard classified Karvelis's occupation as a "Sedentary strength level occupation" and found that the recent FCE report had described Karvelis as

having "demonstrated the ability to perform Light to Moderate strength level work."
(LTD218). Reliance Standard concluded that Karvelis's physical capabilities more than
matched the strength level required by her occupation, so that she did not meet the policy
definition of total disability from a physical standpoint. (*Id.*). With respect to the cognitive
capabilities necessary for work, Reliance Standard noted Dr. Nahmias's report, which
showed that Karvelis participated in a two-hour interview with a fifteen-minute break with
no sign of fatigue or inability to comprehend, concentrate, or answer questions appropriately.
(LTD219). Reliance Standard also considered the evidence that Karvelis had been providing
some schooling or care for children in her home for the last few years. (*Id.*). Reliance
Standard asserted that "performing the duties of a teacher or child care giver" was "more
strenuous than the duties of her regular occupation" and that evidence of such work further
negated her claim of inability to work at her regular occupation. (*Id.*).

On May 22, 2003, Karvelis sent a "Notice of Claim" to Reliance Standard, informing
them that the Social Security Administration had reversed its prior decision and found her
to be totally disabled. (Docket Entry No. 24, Ex. B, Notice of Claim). Karvelis informed
Reliance Standard of her intent to sue after sixty days if Reliance Standard did not pay her
benefits. (*Id.*). Reliance Standard refused to reopen the claim. (LTD033).

## C.   Procedural Background

Karvelis filed this lawsuit against Reliance Standard in state court on July 24, 2003.
Reliance Standard removed the action to this court on September 19, 2003. (Docket Entry
No. 1). Karvelis filed her First Amended Complaint on June 10, 2004. (Docket Entry No.

13).  Reliance Standard filed a motion dismiss the state-law claims, (Docket Entry No. 15), which this court granted on September 15, 2004.  (Docket Entry No. 20).  On October 15, 2004, Reliance Standard moved for summary judgment, (Docket Entry No. 21), and on December 7, 2004, Karvelis filed her response to Reliance Standard's motion and a cross-motion for summary judgment.  (Docket Entry No. 25 & 26).

## II.    The Applicable Legal Standards

### A.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Under FED. R. CIV. P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*,  477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the

outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235

(5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505,

91 L.Ed.2d 202 (1986)).  If the moving party fails to meet its initial burden, the motion for

summary judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge*

*Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving cannot survive

a motion for summary judgment by resting on the mere allegations of its pleadings.  The

nonmovant must identify specific evidence in the record and articulate the manner in which

that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics*

*Trafficking Task Force,* 379 F.3d 293, 305 (5th Cir. 2004).  The nonmovant must do more

than show that there is some metaphysical doubt as to the material facts.  *Armstrong v. Am.*

*Home Shield Corp.,* 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in

the light most favorable to the nonmoving party. *Calbillo v. Cavender Oldsmobile, Inc.*, 288

F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255.  "Rule 56 '*mandates* the entry of

summary judgment, after adequate time for discovery, and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid*

*Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

**B.      The ERISA Standard of Review**

"When the ERISA plan vests the fiduciary with discretionary authority to determine eligibility for benefits under the plan or to interpret the plan's provisions, 'our standard of review is abuse of discretion.'" *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 269 (5th Cir. 2004) (quoting *Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 608 (5th Cir. 1998)); *Vercher v. Alexander & Alexander, Inc.*, 379 F.3d 222, 226 (5th Cir. 2004); *Kergosien v. Ocean Energy, Inc.*, 390 F.3d 346, 356 (5th Cir. 2004); *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 413 (5th Cir. 2003).  "A decision is arbitrary only if 'made without a rational connection between the known facts and the decision or between the found facts and the evidence.'" *Meditrust Fin. Servs. Corp. v. Sterling*, 168 F.3d 211, 215 (5th Cir. 1999) (quoting *Bellaire General Hosp. v. Blue Cross Blue Shield*, 97 F.3d 822, 828–29 (5th Cir. 1996)).  "A decision is supported by substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision." *Courson v. Bert Bell NFL Player Ret. Plan*, 214 F.3d 136, 142 (3rd Cir. 2000) (internal quotations and citation omitted); *see Chao v. Occupational Safety and Health Review Comm'n*, 401 F.3d 355, 362 (5th Cir. 2005) ("Substantial evidence is 'such relevant evidence that a reasonable mind might accept to support a conclusion.'").  A reviewing court may not substitute its own judgment for that of the Plan administrator.  *See Ellis*, 394 F.3d at 273.  Under this highly deferential standard, the decision of the Plan administrator may be overturned only if it is without reason, unsupported by substantial evidence, or erroneous as a matter of law.  *Barhan v. Ry-Ron Inc.*, 121 F.3d 198, 201 (5th Cir. 1997).

If the plan administrator operates under an apparent conflict of interest, the district court should weigh the conflict as a factor in determining the amount of deference due.  *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 297 (5th Cir. 1999).  The Fifth Circuit has stated that "[w]hen a minimal basis for a conflict is established, we review the decision with 'only a *modicum less* deference than we otherwise would.'"  *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 343 (5th Cir. 2002) (emphasis in original) (quoting *Vega*, 188 F.3d at 301).  A more recent Fifth Circuit case makes clear that the fact that an insurer both administers and determines eligibility for benefits does not by itself establish a conflict of interest.  As the Fifth Circuit noted in *MacLachlan v. ExxonMobil Corp.*:

> The district court assumed there is a conflict of interest because Mobil interprets and administers its own plan, leaving open the possibility that it would limit claims to reduce its liability.  The court need not have made this assumption.  The mere fact that benefit claims are decided by a paid human resources administrator who works for the defendant corporation does not, without more, suffice to create an inherent conflict of interest.  Were that enough, there would be a near-presumption of a conflict of interest in every case in which an employer both offers a plan and pays someone to administer it, making a full application of the abuse of discretion standard the exception, not the rule.

350 F.3d 472, 479 n.8 (5th Cir. 2003).  Other Fifth Circuit cases state that a court may conclude that a plan administrator acts under a conflict of interest when the insurer both determines benefit eligibility and pays the benefits claimed.  *Lain*, 279 F.3d at 343 ("In the instant case, the district court held that UNUM had an 'inherent conflict of interest' because it was both the insurer and the plan administrator, which determined whether to pay claims under the policy."); *Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329, 333 (5th

Cir. 2001) (determining that Provident, as plan insurer and administrator "potentially benefitted from every denied claim").  In *Dubose v. Prudential Insurance Co. of America*, an unpublished opinion, the Fifth Circuit recognized an apparent conflict of interest when the insurer was also the plan administrator, but found no error in the district court's deference to the plan administrator's determination of the insured's eligibility for plan benefits.  85 Fed. Appx. 371 (5th Cir. 2003).  In *Ellis v. Liberty Life Assurance Co. of Boston*, the court held that *Vega* did not create a presumption that a "conflict exists *ipso facto*" just because the plan administrator also insures the plan, but that "an ERISA plaintiff must come forward with evidence that a conflict exist — and that any reduction in the degree of deference depends on such evidence. . . ."  394 F.3d 262, 270 n.18 (5th Cir. 2004).

The court's review of factual determinations is limited to the record before the administrator.  *Meditrust*, 168 F.3d at 215.  "[I]t is the plan administrator's responsibility to compile a record that he is satisfied is sufficient for his decision."  *Barhan*, 121 F.3d at 201. The administrative record[19] in a review of a plan administrator's denial of a claim includes "relevant information available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it."  *Estate of Bratton v. Nat'l Union Fire Ins. Co.*, 215 F.3d 516, 521 (5th Cir. 2000).

In *Black & Decker Disability Plan v. Nord*, the United States Supreme Court explicitly rejected the treating physician rule, instead holding that a plan administrator need

---

[19] Evidence outside the administrative record may be admitted for limited purposes, such as evidence related to how an administrator interprets terms of the plan and evidence that assists the district court in understanding complex terminology or medical opinions.  *Bratton*, 215 F.3d at 521.

not give  deference to the opinion of the claimant's treating physician over the opinions and reports of other doctors, including any independent medical examiners or consultants working for the plan administrator.  538 U.S. 822 (2003).  The Court explained that unlike the legal standards governing social security benefits, which require efficient administration of a nationwide program, ERISA is designed to give employers wide leeway.  *Id.* at 832–33. The Court found that ERISA and the Secretary of Labor's regulations promulgated under ERISA "do not command plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition."  *Id.* at 825.  The Fifth Circuit has recently stated that the Supreme Court's decision in *Nord* means that while a plan administrator should consider a treating physicians' diagnosis, it need not be given determinative weight.  *Vercher*, 379 F.3d at 233.

### C.    CFS and ERISA Plan Benefit Determinations

The courts have encountered difficulties in reviewing disability benefit denials for plan participants claiming disability as a result of CFS.  Part of the problem is the relative newness of medical recognition of the disorder.  Beginning in the 1980's, workers began to report experiencing a variety of symptoms, such as high fatigue, headaches and weakness, of unknown etiology, which became known as Chronic Fatigue Syndrome.  Subsequent research has shown that this syndrome appears most often in women and is often associated with symptoms consistent with fibromyalgia, depression, and somatoform disorders, both of which appear in this record as well.  There is disagreement within the medical community about which "objective" markers serve as CFS indicators and about how to measure the

severity of CFS.  The parties have presented a wealth, and a welter, of medical literature, which underscores the lack of medical consensus on the cause, nature, effects, and appropriate treatment of this combination of symptoms.  Insurers and reviewing courts have recognized this confusion.

In *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3d Cir. 1997), the court discussed a frequent issue in CFS cases.  In that case, the court held that it was *prima facie* unreasonable to require claimants with CFS to submit objective evidence of their condition, given that there are no recognized objective physical tests and that the CFS diagnosis is one of exclusion.  A number of courts have adopted this approach.  *See Cook v. Liberty Life Assur. Co.*, 320 F.3d 11, 21–22 (1st Cir. 2003); *Hawkins v. First Union Corp. LTD Plan*, 326 F.3d 914, 919 (7th Cir. 2003) (Posner, J.); *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1112 (9th Cir. 1999); *Burchill v. Unum Life Insur. Co. of Am.*, 327 F. Supp.2d 41, 51 (D. Me. 2004); *Pralutsky v. Met. Life Insur. Co.*, 316 F. Supp.2d 840, 852–53 (D. Minn. 2004); *Maronde v. Sumco USA Group Long-Term Disability Plan*, 322 F. Supp.2d 1132, 1139 (D. Or. 2004); *Sansevera v. E.I. DuPont de Nemours & Co.*, 859 F. Supp. 106, 113 (S.D.N.Y. 1994).  These courts have recognized that an insurer cannot insist on a standard of proof for proving disabling CFS that effectively eliminates the possibility of anyone with CFS actually receiving long-term disability benefits.  On the other hand, courts have recognized that an insurer may insist on objective proof and measures of symptoms and of limits on the ability to work, even when, as with CFS, diagnosis is difficult and subjective complaints such as "fatigue" are the signature of the disease.  *See Friedrich*, 181 F.3d at 1112; *Boardman v.*

*Prudential Ins. Co.*, 337 F.3d 9, 16–17 & n.5 (1st Cir. 2003) (upholding denial of benefits based on lack of evidence of total disability, rather than of underlying diagnosis of CFS). The cases consistently recognize that an insistence on objective evidence is not arbitrary and capricious. *Vercher*, 379 F.3d at 230–31 (upholding a plan administrator's denial of claim based on lack of objective evidence); *Nichols v. Verizon Communications, Inc.*, 78 Fed. Appx. 209, 212 (3rd Cir. 2003) (holding it reasonable to require the claimant to provide objective evidence of her symptoms); *Cook v. New York Times Co. Long-Term Disability Plan*, 2004 WL 203111, at *4 (S.D.N.Y. Jan. 30, 2004) ("[A]n insistence on objective evidence, standing alone, is not arbitrary and capricious.").

In *Welch v. Unum Life Insurance Co. of America*, 382 F.3d 1078 (10th Cir. 2004), the court recently summarized the cases analyzing the problems for disability insurers and courts reviewing their decisions presented by a disorders such as fibromyalgia — and CFS — that have no objective test for diagnosis:

> "Because proving the disease is difficult . . . , fibromyalgia presents a conundrum for insurers and courts evaluating disability claims." *Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1067 (9th Cir. 1999). *Compare id.* (holding that "no objective test exists" for proving fibromyalgia); *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th Cir. 2004) ("[F]ibromyalgia's cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective."); *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) ("[A] growing number of courts, including our own, ... have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease.'") (quoting *Preston v. Sec. of Health and Human Servs.*, 854 F.2d 815, 818 (6th Cir.

> 1988)); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003) (noting that fibromyalgia "itself can be diagnosed more or less objectively by the 18-point test . . . , but the amount of pain and fatigue that a particular case of it produces cannot be"); and *McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 562 (7th Cir. 2000) (holding that fibromyalgia's "cause is unknown, there is no cure, and the symptoms are entirely subjective"); *with Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16 n. 5 (1st Cir. 2003) ("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."); *Brosnahan v. Barnhart*, 336 F.3d 671, 678 (8th Cir. 2003) (noting that Social Security claimant's testimony and reports to the Social Security Administration were "supported by objective medical evidence of fibromyalgia"); and *Russell v. UNUM Life Ins. Co. of Am.*, 40 F. Supp. 2d 747, 751 (D.S.C. 1999) (considering a nearly identical self-reported symptoms limitation and holding that fibromyalgia is an objectively diagnosable condition).

*Id.* at 1087.

Courts have found that CFS can entitle an insured to benefits for total disability.  In *Mitchell*, an engineer was entitled to long-term disability benefits based on proof of fatigue, headaches, and weakness and information from the treating doctor that the insured was "capable of only mild, intermittent activities" and that his "ability to sustain activity, even for few hours per day is unpredictable."  *Mitchell*, 113 F.3d at 441. In *Clausen v. Standard Insurance Co.*, 961 F. Supp. 1446 (D. Colo. 1997), a claimant diagnosed with CFS was found to have been arbitrarily and capriciously denied long-term disability benefits, even in light of private investigator reports to the effect that the claimant was exaggerating symptoms, when the medical evidence that the participant suffered from CFS was uncontroverted and

the claimant's activities shown on a surveillance video were, with one possible exception, not inconsistent with the reports to physicians.  In *Cook v. Liberty Life Assurance Co. of Boston*, 320 F.3d 11, 20–23 (1st Cir. 2003), an ERISA administrator acted arbitrarily and capriciously in terminating the long-term disability benefits of a former participant who had been diagnosed with CFS.  The court held that the administrator could not reasonably expect convincing "clinical objective" evidence of CFS, lacked sufficient information to terminate the disability payments on the ground that the former participant was working part time, and failed to develop contradictory medical evidence.  *Id.* at 21–22.  In *Heffernan v. Unum Life Insurance Co. of America*, the Sixth Circuit upheld a district court's ruling that the insurance company abused its discretion when it denied benefits to the plaintiff.  101 Fed. Appx. 99 (6th Cir. 2004).  The plaintiff had worked as a litigation attorney for a law firm in Cincinnati before stopping work and filing for long-term disability benefits in 1995. *Id.* at 101.  Doctors who had treated the plaintiff in 1995 diagnosed her with major depression and CFS.  *Id.*  The insurance company denied her benefits based on the conclusions of a doctor who seemed to be completely unfamiliar with CFS and dismissed the other doctors' determination that she suffered from it, partly based on the fact that she worked for several years after she claimed she had it, and also relying on the opinions of the head of the plaintiff's litigation department, who opined that her claim was "bogus" and that she just wanted a "lifestyle change."  *Id.* at 103–04.  The Sixth Circuit affirmed the district court.  *Id.* at 107–08.

A number of district courts have also found that a plan administrator abused its discretion in denying or terminating disability benefits for claimants with CFS.  *See, e.g.,*

*Small v. First Reliance Standard Life Insur. Co.*, 2005 WL 486614, at *6 (E.D. Pa. Feb. 28, 2005) (finding that a FCE showing that the participant was physically capable of doing her job did not address the cognitive deficiencies caused by her CFS); Maronde, 322 F. Supp. 2d at 1141 (rejecting a reviewing doctor's conclusions, when completely unsupported by the record, that patient had a somatoform disorder, not CFS, but finding that insurer could not insist on objective measures of CFS); *Pralutsky*, 316 F. Supp. 2d at 852 (finding abuse of discretion when plan administrator relied on the opinion of the insurer's reviewing doctor, who required objective evidence in order to diagnose fibromyalgia or CFS).

Other courts have upheld plan administrators' decisions to deny benefits to plan participants claiming disabling CFS and related conditions, including fibromyalgia.  In *Coffman v. Metropolitan Life Insurance Co.*, the Fourth Circuit ruled that the district court had applied the correct standard of review to an insurance company's decision to deny benefits in a CFS case.  77 Fed. Appx. 174 (4th Cir. 2003).  The district court had applied an abuse of discretion standard, finding that with no consensus diagnosis, no objective medical support for the claimed disability, and a videotape that suggested the plaintiff exaggerated the severity of his illness, the insurance company did not abuse its discretion.  *Id.* at 176.  In *Roach v. Prudential Insurance Brokerage, Inc.*, the Tenth Circuit affirmed a district court's ruling that the plan administrator did not abuse its discretion in denying the plaintiff long-term disability benefits.  62 Fed. Appx. 294 (10th Cir. 2003).  After receiving the claim from the plaintiff, the administrator ordered an independent medical examination, in which the examiner concluded that the plaintiff did meet the CDC criteria for CFS, but with a

reasonable degree of medical certainty, she should still be able to perform her functions as a bank teller.  *Id.* at 296.  A later independent medical examiner came to the same conclusions.  *Id.* at 297.  The Tenth Circuit agreed with the district court that the administrator had substantial evidence, in the form of two independent physicians's conclusions that she did not meet the definition of "Total Disability," despite being diagnosed with CFS.  *Id.* at 299.  In *Nichols v. Verizon Communications, Inc.*, 78 Fed. Appx. at 211, the claimant asserted that the insurer's denial of benefits was improper because it was based on the lack of objective medical evidence confirming her diagnosis and unsupported claims that her fatigue might be the result of either mental illness or the use of alcohol and illicit drugs.  The court found that the record showed that the denial of the claim was based on a number of factors, including the lack of objective tests demonstrating the existence of her symptoms, "something a claimant with CFS might reasonably be asked to provide."  *Id.* at 212.  The court found that the possibility of an underlying diagnosis of depression and the unsubstantiated references to the presence of drug and alcohol use were not central to the opinions of the doctors who examined the claimant on behalf of the insurer, or to its decision to deny benefits.  *Id*.

District courts have also found that plan administrators did not abuse their discretion in denying long-term disability benefits for CFS.  *See, e.g., Maniatty v. Unumprovident Corp.*, 218 F. Supp. 2d 500, 504–05 (S.D.N.Y. 2002) (in dismissing a CFS and fibromyalgia plaintiff's complaint, the court found that subjective reports of symptoms were insufficient; material objective evidence was required);  *Stenner-Muzyka v. Unum Life Insur. Co. of Am.*,

2005 WL 1610708, at *6 (M.D.Fla. July 7, 2005) (finding that the treating physician's diagnosis was too incomplete to support total disability); *Mason v. Hartford Life & Accident Insur. Co.*, 2004 WL 2674352, at *4–5 (S.D.Fla. Aug. 31, 2004) (holding that while the plan administrator would be wrong to deny benefits based on lack of test results showing CFS, the plan administrator rightly denied benefits based on lack of evidence of total disability); *Mallwitz v. Penn Ventilator Co., Inc.*, 2004 WL 114944, at *7 (D. Minn. Jan. 20, 2004) (refusing to allow the plaintiff to "self-diagnose" his own CFS); *Dew v. Met. Life Ins. Co.*, 69 F. Supp. 2d 898, 903 (S.D. Tex. 1999) (ruling that the plan administrator did not abuse its discretion when crediting the reports of two independent medical examiners over the treating physician's conclusory statements that her patient had CFS).

These cases make it clear that the determination and review of benefit eligibility is highly fact-intensive. A few guiding principles are evident from the case law. If the denial of Karvelis's claim is based on the lack of objective medical evidence of disease, which a claimant with CFS would typically be unable to provide, it would run afoul of the courts' recognition that it is arbitrary and capricious for a plan to require objective evidence of the etiology of CFS, when it is widely recognized that there is no conclusive laboratory test for CFS. If the denial of Karvelis's claim is based on the lack of substantial objective medical evidence of symptoms or their affect on her ability to work, or if the denial of the claim is based on substantial evidence that even if she had CFS, her disability was contributed to by a mental or nervous disorder, that would be consistent with opinions upholding insurers' denials of long-term disability benefits.

III.     **Analysis**

A.       **The Conflict of Interest and the Effect on the Standard of Review**

The language of the insurance contract clearly and explicitly grants discretion to Reliance Standard in determining claims; this court's review is limited to determining whether the plan administrator abused its discretion in denying Karvelis long-term disability benefits. (LTD003); *see Ellis*, 394 F.3d at 269.  Karvelis argues that Reliance Standard has an inherent conflict of interest because it both determined eligibility for benefits and paid the benefits claimed, giving it a financial incentive to deny claims.  Karvelis acknowledges the abuse of discretion standard, but asks this court to give less deference to the administrator's findings.  Karvelis asserts that this court should require "concrete evidence" to support the administrator's decision because of the conflict of interest.  (Docket Entry No. 26, pp. 3–4).  Reliance Standard responds that there is no inherent conflict of interest because the denial of a single claim would have little impact and it would lose business by denying valid claims. (Docket Entry No. 30, p. 3).  Reliance Standard focuses on the contractual grant of discretion provision as determining the standard of review of, and the deference due to, the factual conclusions of the administrator.  (Docket Entry No. 21, p. 7).  Even if this court did find an inherent conflict of interest, Reliant Standard urges that on the present record, the standard of review would remain the same, and the only effect would be a slight reduction in the deference accorded the plan administrator's findings.  (Docket Entry No. 21, p. 8).

Under *Ellis*, Karvelis must provide evidence of a conflict of interest, beyond a conclusory assertion.  394 F.3d at 270 n.18.  In *Ellis*, the plan fiduciary that denied the claim

both insured and administered the plan.  *Id.* at 270.  The court found a conflict of interest because the fiduciary admitted a financial interest in the claims that it paid under the plan. *Id.*  In this case, Reliance Standard both determines whether a claimant is disabled and pays out money directly if the claimant is determined disabled.  Even assuming that this amounts to a conflict of interest, there is no other evidence of a conflict of interest or its effect.  The result is a "modicum less deference" to the plan administrator's decision.  *Lain*, 279 F.3d at 343.  "The greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be."  *Vega*, 188 F.3d at 297.  This court considers this potential conflict of interest as a factor in determining whether Reliance Standard's decision to deny benefits to Karvelis was arbitrary and capricious.  As the Fifth Circuit stated in *Vega,*  "[o]ur review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness — even on the low end."  188 F.3d at 297.  To withstand this less deferential abuse of discretion review, the administrator's decision must be "based on evidence, even if disputable, that clearly supports the basis for its denial."  *Id.* at 298.

**B.     The Record to be Reviewed**

This court is limited to the administrative record, with the exceptions noted above. *Bratton*, 215 F.3d at 521.  In its reply to Karvelis's cross-motion, Reliance Standard argues that the Social Security Administration decision of February 12, 2003, that Karvelis was totally disabled, cannot be considered because it came after Reliance Standard's final determination.  (Docket Entry No. 30, pp. 6–7).  Karvelis responds that because the SSA

found her to be totally disabled as of August 26, 1999, it is relevant to whether Reliance Standard was reasonable in denying her long-term disability benefit claim.  (Docket Entry No. 26, p. 13).  Karvelis also points out that she asked Reliance Standard to reconsider the benefit termination in light of the SSA's determination before filing this lawsuit, but that in a letter dated June 17, 2003, Reliance Standard denied her request for another appeal. (LTD033).  Karvelis finds support for her position in a footnote in *Bratton*:  "If the claimant submits additional information to the administrator, and requests the administrator to reconsider its decision, that additional information should be treated as part of the administrative record."  215 F.3d at 521 n.5 (citing *Vega*, 188 F.3d at 300).  In *Vega*, however, the information in doctors' affidavits submitted as part of a request for reconsideration was not part of the administrative record, because the plaintiff filed the lawsuit before giving the plan administrator the affidavits.  188 F.3d at 299–300.

In this case, in October 1998, the SSA found that Karvelis was not disabled.  Five years later, in 2003, the SSA reversed its initial finding and concluded that Karvelis was disabled.  The SSA decision came more than three years after Reliance Standard first denied Karvelis's long-term disability benefits claim, and almost three years after its final decision denying the claim.  In *Vega,* however, the court stated even if information is submitted after a final decision, it should be part of the administrative record when given to the plan administrator as part of a request to reconsider the decision.  188 F.3d at 300.  Karvelis informed Reliance Standard of the SSA's decision in a letter dated May 22, 2003, requesting reconsideration of the benefits termination.  While the letter also stated her intent to sue if

the denial remained in place, the suit was not filed for another two months.  The SSA

decision is appropriately part of the administrative record, but its relevance is limited by the

different criteria for determining disability,[20] the different deference accorded to treating

physicians, *see Nord*, 538 U.S. at 823 (explaining the absence of the treating physician rule

---

[20]   The Social Security Administration used the following definition:

> The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. To meet this definition, you must have a severe impairment(s) that makes you unable to do your past relevant work or any other substantial gainful work that exists in the national economy.

20 C.F.R. § 404.1505(a).

The  Reliance Standard policy defines "total disability" as follows:

> "Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness, during the Examination Period and thereafter an Insured cannot perform the material duties of his/her regular occupation;
>
> > (1) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis.  An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; and
> >
> > (2) "Residual Disability" means being Partially Disabled during the Elimination Period.  Residual Disability will be considered Total Disability.
>
> If an Insured is employed by you and requires a license for such occupation, the loss of such license for any reason does not in and of itself constitute "Total Disability."

(LTD008).

for ERISA plan administrators), and the reliance on different reports of examination.[21]
(Docket Entry No. 24, Ex. B).  Although Karvelis emphasizes the SSA's finding of disability
due to CFS and major depressive disorder, she does not fully explain the implications for this
case, which rests on a policy that limits benefits for disability caused by or contributed to by
mental or nervous disorder, defined to include depressive disorders and somatoform
disorders.

### C.    The December 2000 Decision that Karvelis was No Longer Totally Disabled

Reliance Standard found in December 2000 that although it had provided Karvelis
with disability benefits from 1996 to 2000, she was  no longer "totally disabled" under the
policy terms.  The policy defines "total disability" to mean that an insured cannot "perform
the material duties of his/her regular occupation" because of sickness.  If an insured is
"partially disabled," that is, capable of performing the material duties of her occupation on
a part-time basis or some of the material duties on a full-time basis, she is considered "totally
disabled" after the ninety-day elimination period.  (LTD008).

Reliance Standard defined "his/her regular occupation" as "not a job with a specific
employer, a particular work environment, or a speciality in a particular field.  The regular

---

[21]    Karvelis submitted a  copy of the SSA decision, along with a letter, dated December 30, 2002,
written by Dr. Salvato, which had also been submitted to the SSA.  The letter repeats her diagnosis of CFS
but also diagnoses Karvelis with fibromyalgia. (Docket Entry No. 24, Ex. B). Fibromyalgia "is a widespread
musculoskeletal pain and fatigue disorder for which the cause is still unknown.  Fibromyalgia Network
Website, at http://www.fmnetnews.com/pages/basics.html (last visited July 20, 2005).  Diagnosis of
fibromyalgia consists of pressing eighteen fixed locations on a patients' body; if the patient flinches at eleven
or more, the patient is diagnosed with fibromyalgia. *Hawkins*, 326 F.3d at 916.  Fibromyaglia is very similar
to CFS.  It is often diagnosed together with CFS and one of its symptoms is chronic fatigue. *McPhaul v.
Board of Comm'rs of Madison County*, 226 F.3d 558, 562 (7th Cir. 2000).

occupation is *the* occupation as it is performed in a typical work setting for any employer in the general economy." (LTD036) (emphasis added).  Karvelis asserts that Reliance Standard is applying a more limited definition than is present in the policy.  The record reveals that Reliance Standard is applying criteria to evaluate the "material duties of [the insured's] regular occupation" apart from a particular employer or specialization, and is not converting the insured's regular occupation into any occupation in the general economy.  Other courts have applied similar language in ways consistent with this court's application.  *See Schmidlkofer v. Directory Distributing Assocs., Inc.*, 107 Fed. Appx. 631, 633–34 (6th Cir. 2004) (defining "regular occupation" to mean the insured's general occupation rather than a particular position at a particular employer); *House v. Am. United Life Ins. Co.*, 2002 WL 31729483, at *9 (E.D.La. Dec. 3, 2002) (construing similar language to mean that the claimant must, because of illness, be unable to perform the substantial and material duties of her regular occupation); *Stender v. Provident Life & Accident Ins. Co.*, 2000 WL 875919, at *6 (N.D.Ill. June 29, 2000) (adopting an interpretation of similar language that to be disabled, the claimant must be unable to perform only one of the material or substantial duties of his regular occupation).

Reliance Standard must evaluate the material duties of Karvelis's occupation as a manager in the investment field, working in a typical office environment, without regard to whether she was working in that occupation for AIM Management or for another employer

in the same field.[22] The record reveals that the material duties of Karvelis's occupation required significant levels of concentration and interaction with others, as well as the ability physically to perform desk work, using a computer, for extended periods in a typical office environment.

Reliance Standard does not dispute that Karvelis has CFS, but does dispute that it is the only condition that is causing her symptoms and does dispute that it caused her to be disabled.  Reliance Standard relies primarily on the results of the November 2000 FCE in arguing that Karvelis was physically capable of performing the material duties of her regular occupation and on the results of the February 2000 independent examination performed by Dr. Nahmias in determining that Karvelis was cognitively capable of performing the material duties of her regular occupation.  Reliance Standard notes that other circuits have held that a plan administrator may require objective evidence that the condition diagnosed prevents the claimant from working.

Karvelis asserts that Reliance Standard is requiring objective evidence that she has CFS, a requirement that the case law has rejected.  Karvelis argues that nothing in the record rebuts Dr. Salvato's conclusion that she is both physically and cognitively impaired to a degree that at a minimum makes her incapable of working more than part-time, which would still render her "totally disabled" under the policy terms.

---

[22]  The job description for Karvelis's position at AIM Management stated that the working conditions were a "normal office environment, with little exposure to excessive noise, dust and temperatures; Required to push, pull, lift or otherwise move weights up to 10 pounds; Required to sit for up to 60% of the work day. . . ." (LTD729–730).

The record, as noted, is large.  Dr. Salvato has been energetic in presenting her diagnosis of Karvelis's condition and describing its effects.  But as Reliance Standard observed in its denial letter, much of what Dr. Salvato reported was Karvelis's subjective description of her conditions, symptoms, and sensations.  The record before the plan administrator does not show that Dr. Salvato administered objective tests of physical strength or stamina, or objective tests of memory and ability to concentrate, at least not until after the decision terminating benefits was reached and Karvelis was seeking reconsideration after the SSA had concluded that she was disabled.  Dr. Salvato's records contain results of laboratory tests, clinical observations, such as the presence of swollen lymph nodes and reddened throat, and descriptions of Karvelis's complaints, to confirm the diagnosis of CFS.  But Reliance Standard did not terminate long-term disability benefits on the ground that Karvelis had failed to present objective evidence that she had CFS.  The record reveals that Reliance Standard terminated the benefits on the ground that the independent examinations provided objective evidence that Karvelis was able to perform the physical and mental demands of her occupation, while Karvelis relied on "subjective" and "self-reported" descriptions of her symptoms and limitations.  Karvelis must address not only her subjective symptoms, but her objective ability to perform her former occupation.  The question of whether Karvelis can return to her former job is separate from the presence of her CFS.  *See Roach,* 62 Fed. Appx. at 298 ("I do not contest the fact that Ms. Roach does indeed have this [CFS].  The issue simply boils down to whether this condition can result in total disability."); *Dennis v. Standard Ins. Co.*, 1994 WL 721840, at *2 (9th Cir. Dec. 29, 1994) (holding the mere

diagnosis of CFS, without showing that it rendered the claimant totally disabled, was not enough to meet eligibility requirements); *Cook*, 2004 WL 203111, at *4 (noting that while possible for CFS to cause total disability, plaintiff had not made that showing); *O'Sullivan v. Prudential Ins. Co. of Am.*, 2002 WL 484847, at *9 (S.D.N.Y. Mar. 29, 2002) (holding that the plaintiff had not objectively shown how her CFS rendered her totally disabled).

The objective evidence of the effects of CFS on Karvelis's ability to sit for extended periods and to walk and stand intermittently during a work day came from the FCE.  The FCE performed on November 7, 2000 gave Reliance Standard evidence that Karvelis was physically able to perform the light to moderate physical demands of her regular occupation. (LTD252).  But the FCE only addresses physical capabilities, not mental capabilities, as noted in the FCE itself.  "This is identified to be a valid representation of LESLIE KARVELIS's present *physical capabilities*. . . ."  (LTD252) (emphasis added).  The FCE report stated that Karvelis was able to sit for eight hours a day in sixty minute durations and stand three to four hours in thirty-five minute durations.  Interestingly, although Dr. Salvato consistently stated that Karvelis was limited in her ability to sit, the 1997 FCE, the 2000 FCE, and the testing presented to the Social Security Administration all stated that Karvelis's ability to sit for extended periods was unaffected.

Karvelis points out that the regular duties of her occupation require an ability to concentrate, remember, and interact with coworkers and subordinates.  (LTD729, 539).  The record evidence of an objective measure of Karvelis's ability to concentrate and remember and to interact with others appears to be Dr. Nahmias's psychiatric evaluation.  He found that

she could perform arithmetical computations, name presidents in reverse order, spell words backwards and forwards, remember three out of three objects in five minutes, explain proverbs, respond intelligently to questions asking what she would do in specific situations; and repeat six digits forward and four digits backwards.  In short, she had "no evidence of any fatigue or inability . . . to process information or questions presented to her."  (LTD 389–390).  By contrast, the evidence Dr. Salvato presented to Reliance Standard of Karvelis's mental impairments was limited to the subjective descriptions Karvelis reported to her.  (*See, e.g.*, LTD045–46, 50–53, 84, 87, 89, 92, 113–114).

Dr. Nahmias found that Karvelis had exaggerated her physical and cognitive difficulties, but that this was in itself disabling.  Dr. Nahmias concluded that Karvelis had an "ongoing incapacitating focus on physical syndromes" and did not expect her to be able to return to work for at least six months to one year, and then not to her prior job.  Dr. Nahmias did not explain what features of that job made it impossible for Karvelis to work there, while predicting that she would be able to work in other jobs within her regular occupation.  Dr. Nahmias also concluded that Karvelis would require psychological as well as physiological treatment to be able to return to work within the predicted six to twelve months.  Although Reliance Standard relies on this examination, along with the FCE, to show that Karvelis was physically and mentally capable of working full-time as of March and November 2000, Dr. Nahmias did not reach that conclusion.  To the contrary, he found that as of March 2000, she

was unable to work at all.[23]  The FCE performed in November 2000 showed that Karvelis was physically capable of working, but did not address any of the other deficits Dr. Nahmias and Dr. Portnoy reported.  No other evidence in the record between March and December 2000 allowed Reliance Standard to conclude that Karvelis was mentally capable in December 2000 of returning to her former occupation on a full-time basis.

Reliance Standard points to evidence showing that Karvelis cared for five or six children in her home in the afternoon and evenings.  This evidence does not establish an ability to work full-time in Karvelis's regular occupation.  The policy provides that an ability to work part-time is "total disability"; the only evidence of Karvelis working is on a part-time basis.  Moreover, the record does not establish that caring for five or six children in the afternoon or evening bears a significant relationship to the material duties of Karvelis's regular occupation.

In short, the evidence in the administrative record, even viewed with the deference due the plan administrator, does not support a finding that Karvelis was no longer totally disabled as of March 2000.  As noted, the policy defined "total disability" to include the capability of performing the material duties of her occupation on a part-time basis or some of the material duties on a full-time basis.  Although the most recent FCE available when Reliance Standard denied Karvelis's continued long-term disability benefits provided substantial evidence of her physical ability to perform the duties of her regular occupation, the FCE did not address

---

[23]  In his report, on a line labeled "anticipated return to work date," Dr. Nahmias wrote "maybe 6 mo.-1 yr. (not prior job at AIM)."  (LTD384).

her ability to perform the mental and cognitive demands of her occupation.  *See Small*, 2005 WL 486614, at *6 (plan administrator had abused its discretion because the FCE only measured physical capabilities and there was no substantial evidence that showed an ability to meet the cognitive requirements of the participant's occupation).  The independent examination by Dr. Nahmias showed that while Karvelis did not exhibit the concentration and memory problems she had consistently reported, she did have a mental disorder that prevented her from working.  The information Reliance Standard cited to support its determination that Karvelis was able to return to her regular occupation in December 2000 does not reach that conclusion.  Even without considering the later information provided after the SSA granted her benefits, the denial of long-term disability benefits under the policy on the basis that the administrative record showed Karvelis was no longer disabled was an abuse of discretion.[24]

   This record lacks evidence that was important in cases finding no abuse of discretion in denying disability benefits for a participant with CFS.  In *Coffman*, the insurance company had in its evidence, among other things, a videotape that showed that the claimant exaggerated his illness.  77 Fed. Appx. at 176.  In *Roach*, there was medical evidence that the plaintiff was able to perform all the functions of her customary occupation as a bank

---

   [24]  If this information is considered, see *Vega* and *Bratton*, it fills in some of the objective measures of cognitive and physical functioning that Dr. Salvato's earlier records failed to provide.  For example, in a December 2002 examination, Dr. Salvato performed detailed range of motion and manual muscle testing, presenting objective evidence of loss of muscle strength and restriction in range of motion in various joints. In the same examination, Dr. Salvato tested Karvelis's ability to recall numbers forward and backwards and to recall a certain number of items after five minutes.  Such objective tests of capabilities are not included in Dr. Salvato's earlier examinations of Karvelis.

teller.  62 Fed. Appx. at 296.  In this case, the evidence as of December 2000 is that Karvelis was not capable of returning to work in February 2000 and would not be for at least six months to a year, if she received psychological treatment.  In December 2000, when Reliance Standard affirmed its decision to terminate benefits, the only additional evidence of Karvelis's ability to return to work full-time was the FCE, which measured only physical limitations.  There was no information as to whether Dr. Nahmias's estimate as to her ability to return to work, if she received psychological as well as physiological treatment, had proven correct.  This court concludes that the decision to deny benefits on the basis that Karvelis was not totally disabled was an abuse of discretion.

D.      **The Mental Disorder Limitation**

Reliance Standard also terminated benefits on the ground that Karvelis's disability was caused by or contributed to by a mental or nervous disorder for which the insurer had paid benefits for the contractual maximum of 24 months.  The issue is whether this decision is supported by "substantial evidence" in the administrative record.  *Meditrust Fin.*, 168 F.3d at 215.

The record presents significant evidence of the presence of a mental or nervous disorder that contributed to Karvelis's disability.  In 1996, Karvelis refused to see a psychiatrist when such treatment was recommended by her treating neurologist.  Dr. Salvato initially noted that she could not diagnose CFS without ruling out psychiatric disorders, yet did not have Karvelis examined by a psychologist or psychiatrist.  In 1999, Dr. Portnoy noted Karvelis's description of herself as "emotional" and that she would "start to cry seemingly

without any reason." (LTD409).  Dr. Portnoy was concerned that depression or other psychiatric disease had not been ruled out and that no psychiatric or psychological evaluation had been performed.  Dr. Nahmias did perform such an examination, leading to the diagnosis of a somatization disorder.  Reliance Standard argues that these reports provide substantial evidence that Karvelis's disability was at least contributed to by a mental or nervous disorder.

Karvelis claims that, applying a heightened standard of review, the plan administrator abused his discretion in finding that her condition was caused by or contributed to by mental illness. (Docket Entry No. 26).  Dr. Salvato consistently maintained that Karvelis's condition was not caused by or contributed to by a mental or nervous disorder.  After Reliance Standard denied continuing benefits on this basis, Dr. Salvato stated that "it is my opinion that Ms. Karvelis remains totally and permanently disabled from any substantial gainful employment due to a physical condition." (LTD368).  In short, Dr. Nahmias had diagnosed Karvelis as suffering from a somatoform disorder and CFS and concluded that this disorder had produced an "incapacitating focus on physical symptoms out of proportion to what is usually expected" with CFS; Dr. Salvato had diagnosed Karvelis as suffering solely from CFS, with any signs of depression a result of the disability produced by the physical condition.

When, as here, a plan administrator has two conflicting diagnoses for a participant, the decision to deny the long-term disability benefits is essentially a decision to value the opinion of its independent physicians above the opinion of the plaintiff's physician.  ERISA case law consistently authorizes such decisions, finding them neither arbitrary nor capricious.

*See, e.g., Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 601–02 (5th Cir. 1994) (upholding plan administrator's decision to credit the independent doctors' over that of the treating physician); *Dubose*, 85 Fed. Appx. at 372 (allowing the plan administrator to rely on the opinions of the treating cardiologist and independent medical examiner over the treating physician's); *Turner v. Delta Family-Care Disability & Survivorship Plan*, 291 F.3d 1270, 1274 (11th Cir. 2002) (plan is entitled to rely upon opinion of independent medical examiner); *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 (11th Cir. 1997) (the plan's administrative committee's function was to evaluate the various reports in tandem); *Williams v. Unum Life Ins. Co. of Am.*, 250 F. Supp. 2d 641, 648–49 (E.D. Va. 2003) (defendant did not abuse its discretion by substituting the judgment of its reviewing physicians for the opinion of plaintiff's treating physicians); *Roig v. Ltd. Long-Term Disability Program*, 2004 WL 1857642, at *9 (E.D. La. Aug. 18, 2004) ("Nor is it *per se* abuse of discretion for MetLife to accord greater weight to the opinions of the independent reviewers than to Roig's attending physicians, even though MetLife selected the independent reviewers."). The choice between competing diagnoses is a choice the insurer was entitled to make.

In *Rock v. Unum Life Insurance Co. of America*, the Tenth Circuit upheld a denial of benefits to a plaintiff that was diagnosed with CFS. 1999 WL 1032967, at *3 (10th Cir. Nov. 15, 1999). In 1989, the plaintiff filed for disability benefits because of a mental condition, and after the 24-month limit on benefits for disabling mental conditions had run out, discontinued benefits. *Id.* at *1 In 1994, the plaintiff asked UNUM to reconsider his claim

in light of new evidence that he had CFS, a physical condition.  *Id.*  UNUM refused to reclassify his condition.   The district court upheld that determination, which was subsequently upheld by the Tenth Circuit on review.  *Id.* at *1–2.  In *O'Bryhim v. Reliance Standard Life Insurance Co.*, the insurance company denied the plaintiff long-term benefits, and after several unsuccessful appeals, the plaintiff filed suit in federal court.  1999 WL 617891, at *3 (4th Cir. Aug. 16, 1999).  After a bench trial, the federal court made several factual findings, one of which was that the plaintiff was disabled because of CFS.  *Id.*  The court remanded the case so that the insurance company could determine benefits.  Instead of accepting the factual findings of the court, the insurance company treated the plaintiff as if he had a mental condition, entitling him to less money than if he was disabled by the physical condition of CFS.  *Id.* at *3–4.  The plaintiff again filed suit.  The district court found that the insurance company acted arbitrarily and capriciously in rejecting the findings of fact and substituting its own.  *Id.* at *4.  The Fourth Circuit upheld the district court's ruling, holding that the finding that the plaintiff suffered from CFS was not clearly erroneous, emphasizing the medical testimony that the plaintiff "had many 'classic' symptoms of CFS and that his condition 'unquestionably' satisfied" the CDC's criteria for diagnosis.  *Id.* at *8.  In *Sparkes v. Morrison & Foerster Long-Term Disability Insurance Plan*, the district court denied the parties' motions for summary judgment finding a disputed fact issue as to whether the plaintiff suffered from depression or from CFS.  129 F. Supp. 2d 182, 188 (N.D.N.Y. 2001).

Given the abuse of discretion standard of review, this court finds sufficient support in the record to support the choice to discontinue benefits on the basis that the disability

claimed was caused by or contributed to by a mental disorder.  Dr. Salvato concluded that Karvelis does not suffer from any psychiatric ailment and that her depression is incidental to her chronic fatigue syndrome and therefore physically caused.  Although Dr. Salvato is board-certified in internal medicine and has significant clinical experience in CFS, she nevertheless ruled out the possibility that Karvelis's disabling symptoms were brought about by or contributed to by a psychiatric condition with no apparent basis to support excluding such a condition, such as a psychiatric examination.  In contrast, Dr. Portnoy pointed out that the possibility of a psychiatric condition existed and that Karvelis should be examined by a qualified physician.  The examination was performed and resulted in a conclusion that Karvelis suffered from somatization disorder, as well as chronic fatigue syndrome.  The psychiatric evaluation was summed up by the observation that Karvelis has an "ongoing incapacitating focus on physical symptoms out of proportion to what is usually expected with chronic fatigue syndrome." (LTD061).  Dr. Nahmias's report, along with the evidence that Karvelis could perform well on the cognitive tests he administered, and the evidence that the 2000 FCE showed an improved ability to sit, stand, and walk, is substantial evidence that Karvelis's condition was caused or contributed to by a mental or nervous disorder and had been since when she "self-diagnosed" in 1996.  (LTD062).

In a case from another district court in the Fifth Circuit, a court recently ruled that a plan administrator had abused its discretion when it relied on its consulting physicians' opinions over the opinion of the treating physician. *Cavaretta v. Entergy Corp. Companies' Benefits Plus Long Term Disability Plan*, 2004 WL 2694895, at *11 (E.D. La. Nov. 23,

2004).  In that case, the court found that the consulting physicians had no factual basis for their determinations; they had reviewed the treating physicians' records and then made conclusory, contradicting statements, and were not able to point to any evidence that supported their conclusion.  *Id.*  Reliance Standard, however, used two independent medical examiners, as well as independent providers to perform FCEs.  All the independent medical providers personally interviewed and examined Karvelis and administered a number of tests. Dr. Nahmias's conclusion is based on both his own examination, interview, and evaluation of test results, in addition to a review of Dr. Salvato's records, the FCEs, and Dr. Portnoy's evaluation.  (LTD385).  In such a case, "ERISA plan administrators may choose to rely on the opinions of independent medical consultants rather than on those of a participant's own physicians."  *Salazar v. Owens-Illinois, Inc. Salary Employee Welfare Benefit Plan*, 1997 WL 10022, at *3 (N.D. Tex. Jan. 7, 1997); *see generally Dubose*, 85 Fed. Appx. at 372 (although the claimant's treating physician found the claimant totally disabled, substantial evidence supported the plan administrator's denial of the claim when the independent medical examiner found no evidence of disability); *Michele v. NCR Corp.*, 1995 WL 296331, at *1–2 (6th Cir. May 15, 1995) (holding that when two independent physicians disagreed with the treating physicians statement that it was "probably CFS," the plan administrator did not abuse its discretion in denying the claim); *Solaas v. Delta Family-Care Disability & Survivorship Plan*, 2005 WL 735965, at *3 (S.D.N.Y. Mar. 29, 2005) (holding no abuse of discretion when plan administrator agreed with independent medical examiner that the claimant could return to work despite her CFS, over the conflicting opinion of the treating

physician); *Siebert v. Standard Ins. Co. Group Long-Term Disability Policy*, 220 F. Supp. 2d 1128, 1141–42 (C.D. Cal. 2002) (finding substantial evidence in support of denying the claim when independent medical examination contradicted treating physician's diagnosis of CFS).

This court finds that Reliance Standard did not abuse its discretion in determining that Karvelis's disability was contributed to by a mental disorder and had since at least June 6, 1998.[25] *Vega* allows a court to uphold a plan administrator's decision, while operating under a conflict of interest, when the decision is based on evidence that clearly supports the basis for its denial, even if the evidence is disputable. 188 F.3d at 299. Dr. Nahmias's report clearly supports the basis for denial, because it concludes, based on evidence including medical records since Karvelis first was diagnosed, that her disability was contributed to by a mental disorder. Reliance Standard made a permissible choice between conflicting opinions. *See Sweatman*, 39 F.3d at 601–02.[26]

---

[25] The result is not inconsistent with *Lemaire v. Hartford Life & Accident Insurance Co.*, an unpublished opinion in which the Third Circuit upheld a district court's determination that the plan administrator abused its discretion by applying the 24-month mental disorder limitation in a long-term disability plan for a plaintiff who claimed CFS. 69 Fed. Appx. 88, 93 (3d Cir. 2003). In that case, the insurer did not have any independent medical examination of the plaintiff performed. Instead, it rejected the medical information and evidence as to physical illness as "not objective" and accepted the medical information and evidence of depression as "objective," based solely on a review of the record. The appellate court agreed that this was tantamount to requiring "'objective' medical evidence to establish the etiology of chronic fatigue syndrome, which is defined by the absence of objective medical evidence," forbidden under *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 442-43 (3d Cir.1997). In the present case, by contrast, Reliance Standard did have an independent medical examination performed. The result of that examination concluded that Karvelis had a separate mental disorder, not resulting from the CFS, that was contributing to her disability.

[26] The result does not change even if this court agrees with Karvelis's argument that it is appropriate to consider the results of the SSA review submitted to Reliance Standard in May of 2003. The materials submitted show that on July 18, 2000 and December 3, 2002, Dr. Larry Pollock, Ph.D., administered a

**IV.   Conclusion**

This court grants Reliance Standard's motion for summary judgment and denies Karvelis's cross-motion for summary judgment.  By separate order, this court enters final judgment for Reliance Standard.

SIGNED on July 28, 2005.

_____
Lee H. Rosenthal
United States District Judge

---

neuropsychological evaluation and concluded that Karvelis had a major depressive disorder.  (Docket Entry No. 24, Ex. B).  Because of the different criteria for disability, there is no statement as to the relationship of this disorder to the chronic fatigue syndrome.  Dr. Salvato had insistently denied that Karvelis suffered from a major depressive disorder, and Dr. Nahmias did not find a major depressive disorder present.